## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Eastern Massachusetts Abortion Fund, Gateway Women's Access Fund, Kentucky Health Justice Network, National Network of Abortion Funds, Northwest Abortion Access Fund, and Preterm Access Fund <br><br> Plaintiffs, <br><br> v. <br><br> Matthew James Davis, and John Does 1-15, <br><br> Defendants. | Case No. 1:18-cv-10596 |

**Memorandum of Law in Support of Motion to Dismiss**

CONTENTS

I.      Introduction ...................................................................................................... 1

II.     Plaintiffs' Alleged Facts .................................................................................... 2

III.    Argument .......................................................................................................... 3

    A.  The Court should dismiss all counts against Davis under Rule 12(b)(2) for lack of
        personal jurisdiction. .................................................................................................... 3

    B.  The Court should dismiss Plaintiffs' FACE Act claim because a cyber attack is not
        intentional damage or destruction of the "property of a facility." .................................. 8

    C.  Plaintiffs' Amended Complaint fails to satisfy the heightened pleading standard
        established by the *Iqbal* and *Twombly* cases because it implausibly asserts that Davis is a
        hacker on the basis of a couple deleted tweets. ............................................................ 13

    D.  If the Court does not dismiss this lawsuit, it should transfer the action to the Southern
        District of Florida for Davis' convenience. .................................................................. 17

IV.     Conclusion ...................................................................................................... 17

## I.   INTRODUCTION

Plaintiffs allege that Defendant Matthew James Davis is one of several individuals who conducted a cyber-attack on an online fundraising platform, and have brought claims against him for violating two federal statutes. This Motion presents the following questions:

- In order to exercise personal jurisdiction over an out-of-state defendant on the basis of wrongful internet-based activity, a plaintiff must establish that the defendant knew or intended that the effects of the defendant's activities would be felt in the forum state. Here, Plaintiffs have scarcely alleged that the effects of the alleged cyber-attack were felt in Massachusetts, much less that any attackers intended or knew that the attack would cause injury here. Should the Court dismiss the suit for lack of personal jurisdiction?

- The Federal Access to Clinical Entrances Act prohibits individuals from physically blocking entrances to a facility that provides abortions (and certain reproductive health services) or destroying the facility's property. Here, Plaintiffs claim that hackers violated the Act because they conducted a cyber-attack on a web platform owned by a non-party that does not provide abortions (or any reproductive health services) on the grounds that the attack adversely affected plaintiffs. Does the Act apply to the alleged cyber-attack?

- In the wake of *Iqbal* and *Twombly*, the First Circuit requires a plaintiff to not only plead a plausible claim, but to name a plausible defendant: a plaintiff must connect the defendant to the alleged wrong with more than mere speculation. Here, Plaintiffs accuse Davis of a cyber-attack on a public website based on three of Davis' tweets that sardonically commented on the fact that Plaintiffs' public website was showing billions in spoof donations. Is Davis a "plausible defendant" under First Circuit precedent?

## II.   PLAINTIFFS' ALLEGED FACTS

Plaintiffs are nonprofit organizations dedicated to improving access to abortion.[1] They hold an annual online fundraiser called the National Abortion Access Bowl-a-Thon to raise funds for their services.[2] Plaintiffs allege that in 2016, Davis and other unknown actors disabled the fundraising site, caused the site to register spoof donations of absurd amounts, impersonated Plaintiffs to send disturbing and offensive e-mails to donors, and otherwise impaired the Bowl-a-Thon.[3]

Plaintiffs' alleged basis for accusing Davis of perpetrating this attack is that Davis publicly "tweeted" sardonic comments at one of the Plaintiffs while the attack was ongoing. Specifically, on April 11, 2016 the Bowl-a-Thon website evidently displayed spoof donations of absurd donation amounts.[4] According to Plaintiffs' Amended Complaint, at some point thereafter Davis tweeted three consecutive times, "congratulat[ing] NNAF on 'passing the $830 trillion mark' and add[ing] 'you're gunna [sic] make little boys and girls a complete thing of the past.'"[5] Davis allegedly deleted the tweets moments after sending them.[6] Two years later, Plaintiffs initiated their lawsuit in the District of Massachusetts, accusing Davis and other unknown defendants of violating the Computer Fraud and Abuse Act and the Federal Access to Clinical Entrances Act.[7]

Because it is important to this Motion, Davis notes that Plaintiffs' Amended Complaint lacks allegations that tie the alleged offenses or the resulting harm to the Commonwealth. There

---

[1] Plaintiffs' First Amended Complaint ¶ 1 ("This is a case about a malicious attack on access to abortion … .").
[2] *Id.*
[3] *Id.* ¶ 1.
[4] *Id.* ¶¶ 24-25.
[5] *Id.* ¶ 27.
[6] *Id.* ¶ 28.
[7] *See* Plaintiffs' Complaint (Doc. No. 1).

are *some* alleged ties, no doubt: one Plaintiff is legally domiciled in Massachusetts, and another is based in Cambridge, Massachusetts.[8] Plaintiffs also allege that two Plaintiffs have "offices in Massachusetts," but they do not clarify whether these are the same two domiciled here, and also do not state whether these offices are the principal offices.[9] Otherwise, the nexus to Massachusetts is lacking. Davis, the only defendant named by Plaintiffs, was alleged to live in Florida or Japan.[10]

Further, in the course of their efforts to serve Davis, Plaintiffs submitted affidavits of their counsel and private investigators who had been tasked with identifying Davis' home address.[11] These materials showed, among other things, that Davis resided and worked in Japan; that he had formed a company in Florida; and that he had family in and resided in Florida at some point.

### III.   ARGUMENT

**A.    The Court should dismiss all counts against Davis under Rule 12(b)(2) for lack of personal jurisdiction.**

Plaintiffs have the burden of demonstrating that Davis is subject to this Court's jurisdiction. To that end, Plaintiffs must show Davis had sufficient contacts with the Commonwealth.[12] They have failed to do so here because Plaintiffs have not alleged or shown that (1) Davis has had any contacts with Massachusetts, (2) that the harm from the allegedly wrongful conduct was felt in Massachusetts, or (3) that the person(s) responsible for the

---

[8] *Id.* ¶¶ 4-5.

[9] *Id.* ¶ 14.

[10] *Id.* ¶¶ 11, 28.

[11] *See* Doc. Nos. 9, 10, 18 (detailing Plaintiffs' investigation and results thereof).

[12] *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 n.2 (1st Cir. 2016); *see also Shirokov v. Dunlap, Grubb & Weaver, PLLC,* No. CIV.A. 10-12043-GAO, 2012 WL 1065578, at *8-9 (D. Mass. Mar. 27, 2012) (O'Toole, J., accepting without change the Report and Recommendations of Boal, M.J.)

wrongful conduct intended (or knew) that the effects would be felt in Massachusetts.
Accordingly, the Court should dismiss the Amended Complaint for lack of personal jurisdiction
under Rule 12(b)(2) of the Federal Rules of Civil Procedure (the "Rules").

As this Court observed in May of this year, United States courts recognize two types of
personal jurisdiction: general, and specific.[13] Here, Plaintiffs did not allege—and their subsequent
investigation of Davis and his family did not show—that Davis has any connection with the
Commonwealth sufficient to support the exercise of general jurisdiction.[14]

Plaintiffs' Amended Complaint also fails to allege—and their subsequent of investigation of
Davis and his family did not show—sufficient facts to support the exercise of specific personal
jurisdiction.[15] The only connection between Davis and the Commonwealth is the alleged cyber-
attack on Plaintiffs' online fundraising drive. However, as more fully discussed below, that
allegation will not suffice for two reasons: first, if there is a significant connection between
Massachusetts and the alleged harms suffered by Plaintiffs, the Amended Complaint fails to show
what that is. Second, Plaintiffs have failed to allege any facts tending to show that whoever
perpetrated the attack against the Bowl-a-Thon intended (or even knew) that the harmful effects
would be felt in Massachusetts.

This Court is not the first to consider when alleged wrongful internet-based conduct is
sufficient to subject a defendant to personal jurisdiction. The treatise on *Federal Practice and*

---

[13] *Gallagher v. Amedisys, Inc.*, No. 17-CV-11390-ADB, 2018 WL 2223673, at *4 (D. Mass. May 15, 2018).

[14] *See* Doc. Nos. 9, 10, 18 (detailing Plaintiffs' investigation and results thereof).

[15] *See id.*

*Procedure* by Messrs. Wright and Miller summarizes the present state of personal jurisdiction founded upon such allegations:

> In an important cluster of cases, allegedly tortious Internet content, or allegedly tortious Internet activity, has subjected a defendant to jurisdiction under the "effects test" first articulated in the Supreme Court's decision in *Calder v. Jones*.
>
> ...
>
> Although the Calder effects test has been formulated differently by different courts of appeal, the Ninth's Circuit's approach set out in a recent Internet case is prototypical: "Under *Calder*, personal jurisdiction can be based upon: '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state.'" The Ninth Circuit has recognized that something more is required than that the defendant's act outside the forum state have foreseeable effects in the forum state. Instead, the Internet conduct must "individually target ... a ***known*** forum resident." If the allegedly tortious Internet content does not target an individual who is known to reside in the forum state, most courts will not uphold jurisdiction over the defendant on the basis of the "effects test."[16]

Plaintiffs' Amended Complaint provides no grounds for this Court to uphold jurisdiction on the basis of this test. First, Plaintiffs fail to sufficiently allege that the alleged conduct caused "harm, the brunt of which [was] suffered" in Massachusetts. While Plaintiffs do allege that two of the Plaintiffs are domiciled in Massachusetts, and two (perhaps the same two—the Amended Complaint is not clear) have offices here, that does not establish how much, if any, harm was felt here.

---

[16] Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1073 (4th ed.) (footnotes omitted) (emphasis supplied) (principally citing *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998) (*holding modified on other grounds by*, *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006)).

Second, Plaintiffs' Amended Complaint fails to sufficiently allege that the perpetrators of the attack intended, knew, or indeed would have any reason to believe that the effects of their alleged conduct would be felt in Massachusetts. They cannot dispense with this element. As this Court observed in the 2012 case of *Sun Life Assur. Co. of Canada v. Sun Bancorp Inc.*, "*Calder* requires not only that the effects be felt in the forum state, but also that the defendant's intentional conduct be 'calculated to cause injury there.'"[17]

The *Sun Life* court examined the question of personal jurisdiction in connection with alleged trademark infringement. It noted two justifications for requiring that a defendant intend for the effects to be felt in the forum state in order to support personal jurisdiction. First, if this requirement were dispensed with, "there would be a substantial risk that defendants would be dragged into court in foreign jurisdictions with which they have little to no actual contact simply because a trademark holder happened to reside there."[18] Second, in that case the "location of the trademark holder's *headquarters* is irrelevant with respect to *customers who are confused or deceived*, and therefore arguably is not the real situs of the tort."[19]

These concerns apply here, too. Davis should not be dragged into court to defend himself against allegations of hacking in a foreign jurisdiction where he has little to no contact simply because *some* of the Plaintiffs have *some* connection here. And both here and in *Sun Life*, there is a substantial question as to where the real victims of the wrongful conduct reside. Absent some

---

[17] *Sun Life Assur. Co. of Canada v. Sun Bancorp, Inc.*, 946 F. Supp. 2d 182, 191 (D. Mass. 2012) (quoting *Calder v. Jones*, 465 U.S. 783, 791 (1984).
[18] *Id.*
[19] *Id.* (emphasis supplied).

evidence that any alleged hacker intended (or even knew) that the effects of the conduct would be felt in Massachusetts, personal jurisdiction over Davis is improper.

Finally, Plaintiffs have not established that personal jurisdiction was established under Rule 4(k)(2). In the 1999 case of *United States v. Swiss Am. Bank, Ltd.*, the First Circuit established a clear framework for determining whether a plaintiff has established that personal jurisdiction exists under Rule 4(k)(2)(A).[20] The First Circuit assigned a plaintiff with the initial burden of making out a prima facie case that the rule applies, and Plaintiffs have not done so here.[21]

This Court analyzed the alleged application of Rule 4(k)(2) to an international defendant in the 2012 case of *Shirokov v. Dunlap, Grubb & Weaver, PLLC*.[22] The Court observed that plaintiff had the burden to show that "the putative defendant must be beyond the jurisdictional reach of any state court of general jurisdiction," and that it was likely to fail on this requirement because plaintiff had presented evidence that a defendant operated a sales division in Los Angeles, which "would likely subject [the defendant] to personal jurisdiction there."[23] Accordingly, the Court found that it did not have personal jurisdiction over the defendant and the claims were dismissed.

Here, as in *Shirokov*, Plaintiffs' Amended Complaint alleges—and their subsequent investigation of Davis and his family shows—that Davis would likely be subject to personal jurisdiction in the State of Florida. Accordingly, Plaintiffs are unlikely to fulfill the requirement to prove that Davis is beyond the jurisdictional reach of any state court, and have not demonstrated that this Court has personal jurisdiction over Davis under Rule 4(k)(2).

---

[20] 191 F.3d 30, 41 (1st Cir. 1999)
[21] *Id.*
[22] No. CIV.A. 10-12043-GAO, 2012 WL 1065578, at *8-9 (D. Mass. Mar. 27, 2012) (O'Toole, J., accepting without change the Report and Recommendations of Boal, M.J.)
[23] *Id.* at *16.

For the foregoing reasons, Davis respectfully moves the Court to dismiss Plaintiffs' Second Amended Complaint under Rule 12(b)(2).

**B.     The Court should dismiss Plaintiffs' FACE Act claim because a cyber attack is not intentional damage or destruction of the "property of a facility."**

Plaintiffs' Fifth Count alleges that Davis violated the federal Freedom of Access to Clinic Entrances Act, a 1994 law codified as 18 U.S.C. § 248 (the "Act" or the "FACE Act"). The Act establishes federal subject matter jurisdiction for and enhances legal penalties against those who commit certain violent crimes at a physical facility that provides reproductive health services. This count fails as a matter of law because the conduct alleged in the Amended Complaint—an internet-based attack (or attacks) on a web platform, and in particular a web platform owned by a third-party that does not provide reproductive health services—does not constitute the destruction of the property of a physical location that provides reproductive health services.

The FACE Act was passed in 1994 in response to reported physical violence and obstructionism at and against facilities that provided abortions and other reproductive health services.[24] As this Court observed in 1997, "[t]he Bill as ultimately enacted established federal criminal penalties and civil remedies for the use or threat of violence, physical obstruction, or destruction of property to interfere with access to facilities providing reproductive health care."[25] The Act's legislative history contains no indication that it was meant to apply to hacking.

---

[24] *See generally* H.R. CONF. REP. No. 103-488, at 7 (1994), *reprinted in* 1994 U.S.C.C.A.N. 724, 724.

[25] *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 98 (D. Mass 1997).

Indeed, Plaintiffs acknowledge that although the FACE Act has been in place for almost a quarter of a century, precedent provides no support for applying it to a hacking case.[26] What is true of the Act's precedent is also true of its text.

The Act is violated when someone

> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with … any person because that person is or has been [obtaining or providing reproductive health services], or in order to intimidate such person … from, obtaining or providing reproductive health services; [or]

> (2) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with … any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship; or

> (3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services, or intentionally damages or destroys the property of a place of religious worship … .[27]

Plaintiffs allege that Davis violated subsection three. Therefore, Plaintiffs must allege that the "property of a facility" has been allegedly damaged or destroyed. But for the reasons below, the alleged cyber-attack on the online fundraising platform did not damage or destroy the "property of a facility" under the FACE Act.

The FACE law defines a facility as a physical location where reproductive health services are provided as well as any surrounding physical envelope: "The term 'facility' includes a hospital, clinic, physician's office, or other facility that provides reproductive health services, and

---

[26] Sarah Ashley O'Brien, *Abortion funds band together to sue their cyberattackers,* CNN Business (March 29, 2018, 7:40 PM, https://money.cnn.com/2018/03/29/technology/abortion-fundraiser-cyberattack-lawsuit/index.html ("Carrie Goldberg, one of the attorneys representing the plaintiffs, said there's no precedent for applying this act to a hacking case.").
[27] 18 USC 248(a).

includes the building or structure in which the facility is located."[28]  Although the definition is

recursive—the Act defines a facility as, among other things, any "other facility"—its meaning is

clear. The four enumerated examples of facilities clarify the meaning of "other facility" under

the *ejusdem generis* canon, a textual canon of interpretation described by the First Circuit as

follows: "where words of a particular or specific meaning are followed by general words, the

general words are construed to apply only to persons or conditions of the same general kind as

those specifically mentioned, unless there are other provisions clearly indicating that the rule is

not applicable."[29] Specifically, the enumerated examples indicate that a "facility" is a physical

location where one can reproductive health services.

Other subsections of the FACE Act buttress the conclusion that "property of a facility"

means physical damage to a physical place that provides reproductive health services. Subsection

(d)(2) specifically states that the law should not be construed to "create new remedies for

interference with activities … occurring *outside* a facility … ." (Emphasis supplied). Subsection

(e)(5) of the law defines reproductive health services as health services "provided *in* a hospital,

clinic, physician's office, or other facility … ." (Emphasis supplied.) Each of these references

connote that a facility must be a physical locus and that the prohibited conduct must harm that

facility's property.

Here, there *is* no "facility" at issue. Instead, there was an alleged attack on a web platform

owned and operated by a non-party that does not provide reproductive health services. A

company "Blue Sky Collaborative, LLC" owned a Business Application for online fundraising

---

[28] *Id.* § 248(e)(1).
[29] *Lyman v. Comm'r of Internal Revenue*, 83 F.2d 811, 813 (1st Cir. 1936).

that was used by Defendants.[30] Blue Sky has no alleged connection to reproductive health services—it is apparently a professional fundraising platform. The Blue Sky "Business Application" was allegedly attacked by hackers. When the Bowl-a-Thon website was attacked, Plaintiffs (and particularly NNAF) reached out to Blue Sky for information and remedies.[31] Blue Sky investigated whether the attack affected donors, and Defendants allegedly took control of Blue Sky to steal personal identifying information.[32]

Plaintiffs' argument that the "property of a facility" was damaged is based on their theory that the Plaintiffs themselves are "facilities."[33] Therefore, they reason, damage to any of Plaintiffs' property rights constitutes a violation of the FACE Act. But this theory fails because Plaintiffs are non-profit organizations, not physical facilities.[34] Although Plaintiffs may operate facilities, they do not allege that the "property" of any of their physical locations was damaged or destroyed by the conduct alleged in the Amended Complaint. (If the "property" of Plaintiffs' "facilities" were damaged in violation of the Act, then they would be "aggrieved persons" entitled to maintain an action under the Act, and *still* not facilities.)

Further, the Amended Complaint fails to allege that any qualifying "property of a facility" was damaged. A reading of the FACE Act demonstrates that the word "property" as used in the Act refers to the physical property associated with a location, not any intangible property rights. Concededly, the word "property" is not defined in the FACE Act, and some meanings of the

---

[30] Plaintiffs' Amended Complaint ¶ 20.
[31] *Id.* ¶¶ 23, 26
[32] *Id.* ¶¶ 38, 43.
[33] Plaintiffs' Second Amended Complaint ¶¶ 160, 161.
[34] *Id.* ¶¶ 4-13.

word encompass some intangible rights.[35] However, in the context of the Act the phrase "property of a facility" refers to a building and its associated physical property.

Further, Plaintiffs' allegations concerning the allegedly injured property do not appear to encompass any recognized property right. Paragraph 164 of the Amended Complaint claims that Plaintiffs' "property" was destroyed when Defendants "damag[ed] the donor lists that belonged to Plaintiffs" by "redirect[ing] Plaintiffs' web traffic to a fraudulent donations page."[36] Plaintiffs allegation that the defendants' conduct diverted donors may describe an alleged injury, but it does not describe actual damage or destruction of a donor list. Similarly, paragraph 165 rests on the theory that property was damaged or destroyed because Defendants' spoof donations "depriv[ed] Plaintiffs of donations they otherwise would have received."[37] While the Court can accept Plaintiffs' allegation that the attack diverted donations, Plaintiffs had no "property" in hypothetical donations that defendants allegedly diverted.

In sum, Plaintiffs' argue that the FACE Act establishes federal subject matter jurisdiction over and enhanced penalties against anyone who interferes with any property right of any religious organization or provider of reproductive health services. This conception is inconsistent with the Act's history, text, and precedent. The Act's text demonstrates that it prohibits and penalizes physical property damage, obstructionism, and violence at certain physical locations—providers of reproductive health services, and places of worship. Cyber-attacks of the type

---

[35] Black's Law Dictionary (9th ed.) PROPERTY. ("1. The right to possess, use, and enjoy a determinate thing (either a tract of land or a chattel); the right of ownership <the institution of private property is protected from undue governmental interference>. Also termed bundle of rights.")
[36] Plaintiffs' Second Amended Complaint ¶ 164.
[37] *Id.* ¶ 165.

alleged by Plaintiffs simply does not amount to a violation of the FACE Act. Accordingly, Davis requests that the Court dismiss Count V of the Amended Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### C.   Plaintiffs' Amended Complaint fails to satisfy the heightened pleading standard established by the *Iqbal* and *Twombly* cases because it implausibly asserts that Davis is a hacker on the basis of a couple deleted tweets.

Plaintiffs' five-count federal lawsuit against Davis hangs on a slender thread: three alleged tweets by Davis that sardonically commented on the spoof donations for billions of dollars that were showing up on Plaintiffs' public abortion fundraising site.[38] Federal pleading requires more. In order for Davis to be a "plausible defendant" under First Circuit precedent, Plaintiffs must offer the Court more than speculation based on public tweets.

In the 2011 case of *Peñalbert-Rosa v. Fortuno-Burset*, the First Circuit discussed and applied the pleading standards established by the United States Supreme Court's decisions in *Iqbal* and *Twombly*.[39] In *Peñalbert*, a former government receptionist brought a civil rights action against a number of individuals including the Governor of Puerto Rico, the Administrator of the Governor's Mansion, and the Governor's Chief of Staff.[40] The former receptionist claimed that she was fired for political reasons in violation of the First Amendment.[41] The Court observed that the receptionist's claim was plausible: some politically-motivated firings are unlawful, and "political firings after elections in Puerto Rico are not uncommon."[42]

---

[38] *See* Plaintiffs' Amended Complaint ¶ 27.
[39] 631 F.3d 592, 595 (1st Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).
[40] *Id.*
[41] *Id.* at 594.
[42] *Id.*

However, "save under special conditions, an adequate complaint must include not only a plausible claim but also a plausible defendant."[43] In *Peñalbert,* plaintiff worked in an office building annexed to the governor's mansion, and alleged that the Governor approved or disapproved of all personnel decisions at the governor's mansion.[44] Even so, the First Circuit determined that there was "nothing in the complaint beyond raw speculation to suggest that *the named defendants* participated—either as perpetrators or accomplices—in the decision to dismiss" the plaintiff.[45] The speculative nature of receptionist's allegations against the Governor were fatal to her claim.

The *Peñalbert* Court acknowledged that "ordinarily" it would take as true the allegation that the Governor approved or disapproved of all personnel decisions. But "'ordinarily' does not mean 'always': some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'" The First Circuit summed up its discussion as follows: "Without trying to lay down a mechanical rule, it is enough to say that sometimes a threadbare factual allegation bears insignia of its speculative character and, absent greater concreteness, invites an early challenge—which can be countered by a plaintiff's supplying of the missing detail."[46]

Here, as in *Peñalbert*, Plaintiffs may have pleaded a plausible claim: the Amended Complaint describes a cyber-attack on Plaintiffs' Bowl-a-Thon. However, "an adequate complaint must include not only a plausible claim but also a plausible defendant." Here, the basis

---

[43] *Id.*

[44] *Id.* at 595.

[45] *Id.* at 594-95 (emphasis in original).

[46] *Id.* at 595-96.

for Plaintiffs' allegation that Davis was involved in the alleged hack is threadbare and confined to

four paragraphs of the Amended Complaint.[47] Specifically, Plaintiffs allege that at some

unspecified time after a publicly-accessible Bowl-a-Thon website displayed the receipt of

absurdly large donations,[48] a Twitter account allegedly controlled by Davis tweeted that the

fundraiser had "pass[ed] the $830 trillion mark" and stated "you're gunna [sic] make little boys

and girls a complete thing of the past."[49] Plaintiffs' Amended Complaint bases its conclusion that

Davis perpetrated the alleged hack on nothing more than "the suspicious timing of the tweets,"

"the fact that the tweets were deleted by the accountholder,"[50] and the fact that the Twitter

account was deleted "shortly" after media outlets may have contacted the owner of the Twitter

account.[51] (Plaintiffs' later filings show that the account, in fact, remains active.[52])

Plaintiffs' Amended Complaint lacks any indication that they or anyone on their behalf

conducted forensic examination of the hack and determined that there was reason to believe that

the hack originated in Japan or Florida. Plaintiffs do not claim that they subpoenaed Twitter or

worked with any third party to determine if any information about the alleged hack could be

discovered and linked to Davis (or for that matter, Japan or Florida). Instead, it appears that

Plaintiffs had a hunch that a Twitter user was involved based on the timing of his tweets and the

fact that he apparently has experience with computers.

---

[47] *See* Plaintiffs' Amended Complaint ¶¶ 27-30.
[48] Plaintiffs' Amended Complaint ¶ 25.
[49] *Id.* ¶ 27.
[50] *Id.* ¶ 29.
[51] *Id.* ¶ 30.
[52] *See* Doc. No. 9, ¶ 2(a).

Plaintiffs' allegations do not show that Davis is a plausible defendant because the posting and subsequent deletion of sardonic tweets do not plausibly indicate liability for hacking. This is especially true where the tweets concern a publicized "grassroots" campaign that raises money for an activity that is highly charged and controversial. While Plaintiffs also claim that the "timing" of the tweets was "suspicious," the Amended Complaint lacks sufficient detail for the Court to adopt that characterization. The Amended Complaint lacks the details that support Plaintiffs' assertion such as information on the timing of the alleged tweets relative to the appearance of the spoof donations, or information on the quantity or substance of other tweets about the drive from around the same time period. Although Plaintiffs do characterize Davis as an "anti-abortion activist," they allege no facts to support that characterization other than the above-cited tweets.

In *Peñalbert*, the plaintiff's complaint did not demonstrate that the Governor was a plausible defendant even though her complaint showed that she was a government employee formerly in the employ of Puerto Rico, her complaint alleged wrongful termination, she worked in a building annexed to the Governor's mansion, and she specifically alleged that the Governor "approve[d] or disapprove[d] of all personnel decisions" including hers. Davis respectfully submits that the plaintiff's alleged justification for joining the Governor in *Peñalbert* was less speculative than Plaintiffs' alleged justification for joining Davis here. As in *Peñalbert*, Plaintiffs' "threadbare factual allegation bears insignia of its speculative character," and "absent greater concreteness, invites an early challenge—which can be countered by a plaintiff's supplying of the missing detail."

**D.     If the Court does not dismiss this lawsuit, it should transfer the action to the Southern District of Florida for Davis' convenience.**

Davis presently resides in Japan, but has significant familial and commercial ties to Florida. Federal law permits the Court, in the interest of justice, to transfer this civil action to any other district where the action might have been brought for the convenience of parties and witnesses.[53] Although Plaintiffs have chosen this District as their venue, Davis respectfully requests that the Court transfer venue to the Southern District of Florida if this case is not dismissed. Plaintiffs are six different non-profits who are spread across the country.[54] Therefore, they face inconvenience no matter the venue. Although one Plaintiff does have a "legal domicile" in Massachusetts, its 30 staff members are evidently spread across 13 states. Another Plaintiff is a Massachusetts-based organization, but the Amended Complaint does not suggest that this Plaintiff's witnesses are significant to the matter.

## IV.     CONCLUSION

For the foregoing reasons, Davis respectfully requests that his Motion to Dismiss be granted. If it is not, Davis respectfully requests that the Court transfer the action to the Southern District of Florida.

---

[53] 28 USC § 1404.

[54] *See* Plaintiffs' Second Amended Complaint ¶¶ 4-9.

Respectfully Submitted,

Dated: December 17, 2018

Matthew James Davis,

/s/ William K. Wray Jr.
William K. Wray Jr. (BBO No. 689037)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: 401.274.7200
wwray@apslaw.com

## Certificate of Service

I hereby certify that this document filed through the ECF system will be served electronically to the registered participants as identified on the Notice of Electronic Filing [NEF] and paper copies will be served via First-Class U.S. Mail to those indicated as non-registered participants on December 17, 2018.

/s/ William K. Wray, Jr.
William K. Wray, Jr.

930068.v3